Felicia BURCH, et al., on behalf of themselves and other individuals similarly situated, Plaintiffs,

v.

QWEST COMMUNICATIONS INTERNATIONAL, INC., et al., Defendants.

Civil No. 06–3523 (MJD/AJB).

United States District Court, D. Minnesota.

Dec. 16, 2009.

See, also, 2010 WL 529427.

Donald H. Nichols, James H. Kaster, Matthew C. Helland, Sofia B. AnderssonStern, Matthew H. Morgan, Paul J. Lukas, and Reena I. Desai, Nichols Kaster & Anderson, PLLP, for Plaintiffs.

Daniel C. Barr, Jill L. Ripke, and M. Bridget Minder, Perkins Coie Brown & Bain, PA, and Melissa Raphan, Robert R. Reinhart, and Ryan E. Mick, Dorsey & Whitney LLP, for Defendants.

## MEMORANDUM OF LAW & ORDER

MICHAEL J. DAVIS, Chief Judge.

## I. INTRODUCTION

This matter is before the Court on Defendants' Motion for Decertification of Conditional Class [Docket No. 306]; Plaintiffs' Motion in Support of Class Certification [Docket No. 312]; and Plaintiffs' Motion in Support of Partial Summary Judgment [Docket No. 317]. The Court heard oral argument on August 14, 2009.

## II. BACKGROUND

### A. Factual Background

#### 1. Parties and General Background

Defendants Qwest Communications International Inc., Qwest Communications Corporation, and Qwest Corporation (collectively "Qwest" or "Defendants") operate Consumer Call Centers and Small Business Call Centers in multiple states. The locations, number, and types of call centers have changed over the past few years. During the relevant time period, Qwest has operated inbound call centers in various states, serving consumer and small business customers.

Plaintiffs are more than 1,500 current and former non-exempt employees in Qwest's Small Business and Consumer Call Centers throughout the country. Plaintiffs are paid salary plus commission for all hours worked up to 40 hours per work week. Qwest's stated policy is to pay overtime of at least one-and-a-half times Plaintiffs' regular rate for hours worked over 40 per week.

Plaintiffs' primary job duties are answering inbound calls from Qwest customers or potential customers and dealing with service or sales issues. Plaintiffs have sales goals and availability goals (based on the amount of time the employee is ready to answer inbound calls from Qwest customers). All Plaintiffs are subject to the same company-wide time monitoring and compensation policies. Product lines, availability goals, sales goals, type of chains of command, and time monitoring practices are consistent across different call centers.

#### 2. Qwest's Time Management and Compensation Methods

Qwest's corporate representative testified that Qwest pays its Sales Consultants and Sales and Service Consultants "based on the schedule, which includes all updates

throughout the day." (Olvey Rule 30(b)(6) Dep. 55.) However, the Consultant needs to report the additional time worked—any additional time simply logged onto the system will not be counted for payment unless the Consultant affirmatively reports the extra time worked or a manager notices the overtime. Plaintiffs are required to affirmatively ask for compensation for the time they spend working in excess of scheduled time.

Qwest uses a system called Total View to maintain Consultants' work schedules and general payroll. Qwest uses the Total View system nationwide. Consultants' schedules are set into Total View more than two weeks in advance and include the start and end times for each shift, as well as scheduled break and lunch times. Total View then tracks, in real time, whether a Consultant is adhering to her schedule or not, based on when a Consultant logs into and out of the phone. Based on input from the Consultants or their superiors, the schedules are then updated on a real time basis to reflect the Consultants' actual schedules. Payroll is generated from the final updated schedules as reflected in Total View.

Each work day, Qwest's Total View scheduling system contains both "Scheduled Time" and "Actual Time" for each Consultant. Scheduled Time shows the shift that the Consultant is assigned to work, plus any adjustments made to reflect the Consultant's actual activities, such as reported overtime, disability leave, and personal time. The Total View system sends the adjusted Scheduled Time to Qwest's payroll system. If a Consultant reports overtime, the Scheduled Time is updated to reflect the overtime worked. Consultants can report overtime by signing an exceptions log; by notifying the Resource Allocation Specialist desk in each call center by telephone or in person; or,

more recently, by inputting overtime themselves directly into the Web Station system.

Actual Time only reflects a Consultant's phone log-in and log-out activities and his status selected on the phone, such as open taking calls, meeting time, lunch, or break. It does not account for circumstances such as "entitlement" time, which includes vacation or FMLA leave; Consultants who forget to log out of their phones or miscode their time; Consultants working on special projects where they are not logged onto the phones; or technical problems with the computer systems. Actual Time does not provide information to Qwest regarding what a Consultant is doing if she is not logged into the phone. So, Actual Time could be less than Scheduled Time. Even if Total View shows that an employee's Actual Time worked is longer than the employee's Scheduled Time, the employee is paid based on the adjusted scheduled work time. In other words, the Total View system will not automatically add time to Scheduled Time; overtime must be affirmatively reported.

According to Qwest, its phone log-in system does not serve as Plaintiffs' time clock, nor is payroll generated based on phone log-in and log-out times. Instead, the phone system is one of the ways that Qwest monitors Consultants' adherence to their schedules. Local Mission Control departments in each call center compare Consultants' actual phone activity with their scheduled activity in order to monitor Consultants' adherence to their schedules. Mission Control will then attempt to contact out-of-adherence employees to assess the situation. Local Mission Control can only monitor activities as long as Consultants are logged into their phones.

Qwest does not maintain computer log-in records, which would show when Consultants log into or out of their computers.

Unless Plaintiffs affirmatively reported overtime, Total View would not capture Plaintiffs' alleged pre- or post-shift activities such as reading e-mails, completing sales and service orders, or performing customer call backs. However, the records would reflect scenarios in which the employee logs into Total View and begins to receive calls before the start of his schedule shift or stays on the telephone after the end of his scheduled shift.

Qwest has three categories of overtime: mandatory overtime, voluntary overtime, and incidental overtime. Mandatory and voluntary overtime is required or requested by Qwest, is scheduled in advance, and is included in the Scheduled Time submitted to payroll. Incidental overtime is spent completing the last call of the day; however, Qwest will only pay for that time if the Consultant affirmatively reports the time, although Qwest has contemporaneous knowledge of and monitors that incidental overtime work as it occurs.

Plaintiff Matthew Burch testified that Qwest denies payment for incidental overtime if a Consultant does not report the overtime until the next day. Other Consultants averred that they could report incidental overtime the next day and still receive payment.

According to Qwest, in the past, it trained Consultants that the first act of their work day was to log into the phone and the last act of the work day should be to log off of the phone. In 2006 and 2007, Qwest began changing the policy at call centers so that Consultants were scheduled to start their shifts five or fifteen before they are scheduled to be available to take calls in order to allow for boot up time and meetings.

### 3. Qwest's Policies Regarding FLSA Enforcement

Qwest has a written policy prohibiting off-the-clock work and requiring Consul-tants to be compensated for all time worked. The policy requires nonexempt employees to report all work performed outside of their scheduled shifts and requires them to take scheduled breaks. Every year, Consultants must review Qwest's Code of Conduct, which includes a ban on falsifying time reports.

Qwest claims that its supervisors conduct regular training regarding the FLSA requirements and Qwest's ban on off-the-clock work. Supervisors remind employees during team "huddles" and by email that Qwest bans off-the-clock work and that all time worked should reported. Additionally, Consultants' coaches walk the floor of the call center throughout the day to monitor whether Consultants are working off the clock.

### 4. Pre–Shift Work

Generally, Plaintiffs testified that they usually started work 10 to 15 minutes before the start of their scheduled shifts. Plaintiffs testified that, before the start of their scheduled shifts, they were required to log into their computers and several software applications in order to be ready to accept calls from Qwest customers the moment their scheduled shifts began. Various Plaintiffs also testified about a variety of other tasks that they performed before their shifts began, such as reading work emails.

Qwest counters that, in fact, Plaintiffs were trained that the first task of their workday was to log into their phones, not their computers. It points to testimony that Consultants did not need to start all of their computer programs before taking a call and that they were trained to access all of the necessary programs when the customer provided a phone number. Alternatively, Consultants could place their phone on a status that allowed them to not receive calls until their computers were

ready. Qwest emphasizes the testimony of employees such as Aaron Almeroth, that they did not perform off-the-clock work as Consultants.

Plaintiff testimony about pre-shift work is varying. According to some Plaintiffs, such as Shelly Ahmed, Qwest management directed them to arrive at work at least fifteen minutes early to boot up their computers and open several applications so that they would be ready to answer customer calls at the start of their scheduled shifts. Other Plaintiffs, such as Gena Margason, testified that Qwest directed them to log into their phones at the same time or before they log into their computers, but that, in practice, they logged into their computers first.

Some Plaintiffs, such as Chezron Nance and Ronald Schneberger admitted that Qwest managers told them not to work off the clock. Other Plaintiffs, such as Robert Godfrey and Mary Rosario, testified that no one explicitly told them to arrive early to start their computers or perform other pre-shift work, but that they had to do so in order to fulfill Qwest's requirement that they be ready to take calls at the start of their shifts. Many Plaintiffs testified that they could not assist customers until their computer programs were loaded.

### 5. Work During Breaks

Some Plaintiffs testified that, before their shifts, after their shifts, or during their breaks, they performed other unpaid tasks, such as customer call-backs, reading and responding to mandatory e-mails from Qwest management, and completing sales reports and orders. For example, Shelly Ahmed testified that she would work through a break approximately twice a month on various tasks. Other Plaintiffs, such as Dean Vetter, testified that they did not perform off-the-clock work during rest or meal breaks.

Gena Margason testified that she had to work through her meal breaks or before her shift in order to meet the sales and availability quotas set by Qwest and avoid termination. Qwest provides contrasting Consultant testimony, such as the declaration of Otis Artis, that off-the-clock work was not necessary to meet its performance goals.

### 6. Post-Shift Work

Some Plaintiffs, such as Matthew Burch, testified that, after the end of their shifts, they were required to close down multiple software programs and shut down their computers and also perform various other tasks, such as reviewing orders. Other Plaintiffs, such as Gilbert Ruiz, testified that they never worked after their shifts ended.

### 7. Frequency of Off–the–Clock Work

Overall, Plaintiffs claim that they worked off-the-clock on a routine basis.

### 8. Opinion of Dr. White

Plaintiffs' expert, Dr. Paul White, analyzed Qwest's electronic data (its security badge swipe records, its Total View timekeeping records, its sales and service order data, and its payroll records) and determined that Plaintiffs regularly arrive at work approximately 15 minutes before the start of their shifts and that Plaintiffs are logged into Qwest's Total View system for longer than their Scheduled Time. White cannot confirm Plaintiffs' activities during these 15 minutes. White further testified that he could not determine whether Plaintiffs were performing compensable work outside of their regular shifts.

Based on White's analysis, the average employee's first sales and service timestamp is 3.1 minutes before the first Total View timestamp, and the last sales and service timestamp is 2.6 minutes after the last Total View timestamp. However, White admits that it is impossible to tell

who placed a given sales or service order because other Qwest employees, such as Help Desk employees, sometimes work on a Consultant's sales or service data and, when they do that, they work under the ID of the Consultant who originated the contract. White did not analyze whether any Plaintiffs worked during their meal or rest breaks.

Qwest's expert, Patrick Gregg Curry, opined that it was possible that Plaintiffs performed off-the-clock work, but that he cannot confirm that.

Qwest asserts that Total View and security badge data do not track compensable work time. For example, White asserts that data shows approximately 15 minutes between an employee swiping her security badge to enter a Qwest building and logging onto a phone. Qwest counters that it takes many Consultants several minutes to get to their desks. There is testimony from some employees that, as Consultants, they arrived early to work for reasons unrelated to performing work, such as getting coffee before their shift started. White admits it would be impossible for Plaintiffs to log into their phones and begin performing compensable work immediately upon entering the building.

### 9. Evidence of Qwest's Knowledge of Off–the–Clock Work

#### a. *Moon* Lawsuit and Subsequent Audits

In 2002, a lawsuit was filed against Qwest in the District of Idaho regarding off-the-clock work by Sales Consultants and Sales and Service Consultants. *Moon v. Qwest Commc'ns Int'l, Inc.*, Court File No. 1:02–cv–00579 (EJL) (D.Idaho). The case was settled, and, as a result of the settlement, Qwest implemented certain changes, such as issuing a written off-the-clock policy and improving the speed and ease of use of its computer system so that

Consultants would not be forced to work off the clock in order to complete their work.

Also, as part of the *Moon* settlement, in 2003, Qwest performed an audit to determine whether employees were properly classified as exempt or non-exempt and whether any non-exempt employees were entitled to compensation for unreported overtime. Because of the 2003 audit, Qwest paid some employees that it determined were owed compensation for unreported overtime.

In 2005, to follow up after the *Moon* settlement, Qwest conducted another internal audit to determine whether call center employees were working off the clock. The auditors collected observational and anecdotal data regarding approximately 20 Consultants in one call center, on one day.

Qwest discovered that call center Consultants were arriving at work and logging onto their computers before the start of their scheduled shifts, although there was no evidence that Qwest instructed them to do so. The audit team also found that there was no evidence that Qwest had distributed its off-the-clock work policy to call center employees. The audit team further concluded that the process used to ensure that employees took breaks was inconsistent.

Qwest did not compensate any employees as a result of the 2005 audit. However, Qwest claims that it did implement additional practices as a result of the audit:

> prohibiting employees from sitting at their desk other than when they are working, clarifying for employees when they should and should not be booting up their computers, making it clear to employees that they are not to be using e-mail or the internet for business purposes on their breaks. I believe they designated some computers for people in

the break room so they could use them on their breaks for personal reasons. (DuWaldt 30(b)(6) Dep. 69–70.)

Also in response to the 2005 audit, Qwest's legal department developed and conducted regular training for managers and employees regarding off-the-clock issues and the FLSA.

### b. Management's Observations

Many Plaintiffs testified that Qwest's supervisors observed Plaintiffs working off-the-clock. Additionally, several former Qwest managers averred that they witnessed Consultants working off-the-clock before and after their scheduled shifts. Certain former managers averred that upper management was aware of off-the-clock work by Consultants and openly condoned this activity as a business need. Christopher Denzin, a Qwest Rule 30(b)(6) corporate designee, observed Consultants working off-the-clock throughout his time at Qwest, up until a week before his Rule 30(b)(6) deposition.

However, other Plaintiffs, such as Darcina Carney Hahn, testified that their managers would not have known if they were working off the clock. Additionally, because Plaintiffs were not logged into their phones, Local Mission Control would think that they were not working. Several managers of the named Plaintiffs have submitted declarations that they did not see those Plaintiffs working off the clock. There is also evidence from both managers and Plaintiffs that, when a manager did witness a Consultant working off the clock, the manager ensured that the Consultant was compensated or instructed to stop performing off-the-clock work.

### c. Evidence Regarding Plaintiffs' Reporting of Overtime

Overall, Plaintiffs regularly received pay for overtime. For example, over a five-year period, more than 84% of the Representative Plaintiffs' paychecks contained overtime payments and almost half included voluntary and/or incidental overtime. There is no evidence that Plaintiffs ever reported or asked to be paid for the alleged off-the-clock work at issue in this lawsuit.

### B. Procedural Background

On August 30, 2006, Plaintiffs filed a putative class action Complaint against all three Defendants alleging violations of the FLSA, violations of the Minnesota Fair Labor Standards Act ("MFLSA"), and unjust enrichment. The Complaint was filed on behalf of persons working at Qwest's St. Paul, Minnesota Call Center.

On April 10, 2007, Plaintiffs filed an Amended Complaint on behalf of all current and former Call Center Sales Consultants and/or Sales and Service Consultants working at Qwest's call centers nationwide.

On July 27, 2007, this Court granted Plaintiffs' motion to conditionally certify and provide notice to an FLSA class of persons who worked as Sales Consultants or Sales and Service Consultants at a Qwest Small Business or Consumer Call Center anywhere in the United States from August 30, 2003 to the present. [Docket No. 92]

On December 20, 2007, Plaintiffs filed their Second Amended Complaint against Qwest Communications International, Inc.; Qwest Communications Corporation; and Qwest Corporation. [Docket No. 244] The Second Amended Complaint alleges Count I, Violations of the FLSA for failure to pay minimum wage and overtime; Count II, Violation of the MFLSA Minimum Wage and Overtime Requirements; Count III, Violation of the MFLSA Rest and Meal Break Requirements; Count IV, Violation of the MFLSA Record Keeping Requirement; Count V, Violation of the Colorado

Minimum Wage Act and Regulations Promulgated Thereunder; Count VI, Violation of Oregon State Law and Regulations Promulgated Thereunder; Count VII, Violation of Washington State Law: RCW 49.46.130; Count VIII, Violation of Washington State Law: RCW 49.48; and Count IX, Violation of Washington State Law and Regulations Promulgated Thereunder: RCW 49.12.010 and WAC 296–126–092. The claims are all based on the allegation that Plaintiffs and similarly situated employees nationwide did not receive pay for the time that they spent performing necessary work tasks before and after their scheduled shifts. Plaintiffs also allege that they have been denied work and meal breaks and have not been compensated for working during breaks.

Plaintiffs seek to certify state law classes for Counts II through IX consisting of "all Sales and Service Consultants and/or Sales Consultants at Qwest's Call Centers in Minnesota, Colorado, Oregon or Washington during the applicable statutory period, and who are not exempt from coverage under state law." (Second Am. Compl. ¶ 30.)

Based on the large number of opt-in Plaintiffs, the Court ordered that discovery should be conducted on a representative basis of 150 randomly selected class members. Ninety-seven representative Plaintiffs have responded to interrogatory requests from Qwest and twenty-eight Plaintiffs have been deposed.

### III. QWEST'S MOTION TO DECERTIFY THE FLSA CLASS

#### A. Legal Standard

■ The Court performs a two-step process to determine whether a case should be certified under the FLSA:

First, the court determines whether the class should be conditionally certified for notification and discovery purposes. At this stage, the plaintiffs need only establish a colorable basis for their claim that the putative class members were the victims of a single decision, policy, or plan. In the second stage, which occurs after discovery is completed, the court conducts an inquiry into several factors, including the extent and consequences of disparate factual and employment settings of the individual plaintiffs, the various defenses available to the defendant that appear to be individual to each plaintiff, and other fairness and procedural considerations.

*Dege v. Hutchinson Tech., Inc.*, Civil No. 06–3754 (DWF/RLE), 2007 WL 586787, at *1 (D.Minn. Feb. 22, 2007) (unpublished) (citations omitted).

■ In the first step,

the Court only must determine whether Plaintiffs have come forward with evidence establishing a colorable basis that the putative class members are the victims of a single decision, policy, or plan. The court does not make any credibility determinations or findings of fact with respect to contrary evidence presented by the parties at this initial stage.

*Id.* at *2 (citations omitted). This Court held that Plaintiffs met the first step when it issued its Order conditionally certifying the FLSA class on July 27, 2007. This case is now at the second step.

At this stage, the court has much more information on which to base its decision, and makes a factual determination on the similarly situated question. If the claimants are similarly situated, the district court allows the representative action to proceed to trial. If the claimants are not similarly situated, the district court decertifies the class, and the opt-in plaintiffs are dismissed without prejudice. The class representatives—

i.e. the original plaintiffs—proceed to trial on their individual claims. *Carlson v. C.H. Robinson Worldwide, Inc.,* Civ. Nos. 02–3780 (JNE/JJG), 02–4261 (JNE/JJG), 2006 WL 2830015, at *3 (D.Minn. Sept. 26, 2006) (quoting *Mooney v. Aramco Servs., Inc.,* 54 F.3d 1207, 1213–14 (5th Cir.1995) (footnote omitted), *overruled on other grounds by Desert Palace, Inc. v. Costa,* 539 U.S. 90, 123 S.Ct. 2148, 156 L.Ed.2d 84 (2003)). The merits of the plaintiffs' claims are not considered at the decertification stage. *Nerland v. Caribou Coffee Co., Inc.,* 564 F.Supp.2d 1010, 1019 (D.Minn.2007). The Court's decision regarding decertification is within its discretion. *Id.* at 1018.

### B. Whether Plaintiffs Are Similarly Situated

#### 1. Similarly Situated Standard

An action under the FLSA may be maintained against "any employer ... by any one or more employees for and in behalf of himself or themselves and other employees similarly situated." 29 U.S.C. § 216(b).

■ The similarities required to sustain a collective action "must extend beyond the mere facts of job duties and pay provisions." *Anderson v. Cagle's, Inc.,* 488 F.3d 945, 953 (11th Cir.2007) (citation omitted).

> At the second stage, the district court conducts a fact-intensive inquiry of several factors, including: (1) the extent and consequence of disparate factual and employment settings of the individual plaintiffs; (2) the various defenses available to defendant which appear to be individual to each plaintiff; and (3) fairness and procedural considerations. Employees bear the burden of demonstrating that they are similarly situated.

*Carlson,* 2006 WL 2830015, at *3 (citing *Thiessen v. Gen. Elec. Capital Corp.,* 267 F.3d 1095, 1102–03 (10th Cir.2001)) (other citations omitted). Another question the Court considers is if Plaintiffs can "demonstrate that the Defendant[ ] had a common policy or plan in violation of the FLSA that negatively impacted the original and opt-in Plaintiffs." *O'Brien v. Ed Donnelly Enters., Inc.,* No. 2:04–CV–00085, 2006 WL 3483956, at *3 (S.D.Ohio Nov. 30, 2006) (citation omitted).

### 2. Whether Qwest Had a Common Policy or Plan Requiring Off-the-Clock Work

■ Qwest argues that its written policies prohibit off-the-clock work. It claims that there is no evidence Qwest required or encouraged off-the-clock work. When there is no uniform policy requiring off-the-clock work, this fact weighs heavily in favor of decertification. *See, e.g., O'Brien,* 2006 WL 3483956, at *4 (granting decertification in part because "Plaintiffs [ ] failed to offer sufficient evidence to establish the existence of a common plan or policy violating the FLSA").

Qwest also argues that Plaintiffs present no consistent reason or policy for their asserted off-the-clock work. Some Plaintiffs testified that although Qwest did not want them to work off the clock, they felt forced to log into their computer in order to be ready for the start of their shifts. Qwest admits that some Plaintiffs did testify that they were told during training that they needed to come into work early to boot up their computers and open software. However, other Plaintiffs testified that they were specifically instructed not to work before their scheduled shifts and to report all time worked. Still other Plaintiffs testified that no one told them to arrive early to start their computers or perform pre-shift work. Qwest asserts that Consultants could log into their phone and then put the phone on "make busy" as they start their computers. Qwest also

argues that simply because Plaintiffs swiped their security badges 15 minutes before logging onto their phones does not mean that they started compensable work at that time.

Additionally, Plaintiffs provide varying testimony regarding whether they performed other compensable tasks, such as reading emails and making customer call backs, pre-shift, post-shift, or during breaks. There is no allegation that Qwest instructed Plaintiffs to perform these tasks, and there is substantial Consultant testimony that they did not do so.

Qwest also argues that there was no policy of paying Consultants based only on their scheduled time. Instead, the evidence shows Consultants are paid based on their scheduled time, plus any adjustments made to reflect their actual activities, including overtime. Plaintiffs testified that they regularly reported and were paid for overtime.

Plaintiffs assert that they have established that Qwest practiced a universal illegal payment practice of paying Plaintiffs based on scheduled time rather than actual work time. They also claim Qwest had a universal practice of requiring Plaintiffs to arrive early to boot up their computers and log into numerous software applications before their shifts.

Plaintiffs argue that it is irrelevant that Qwest had a written off-the-clock policy if Plaintiffs can show that, despite that policy, they were subjected to a "common impermissible practice." *Wilks v. Pep Boys*, No. 3:02–0837, 2006 WL 2821700, at *5 (M.D.Tenn. Sept. 26, 2006), *aff'd* 278 Fed.Appx. 488 (6th Cir.2008). Plaintiffs further note, "Nor does the fact that all of the putative class members were paid *some* overtime defeat a finding of similarly situated, given that all of the deposed opt-ins also consistently claim that they were not paid overtime for *all* of the hours they

worked." *Falcon v. Starbucks Corp.*, 580 F.Supp.2d 528, 536–37 (S.D.Tex.2008).

■ The law does not require that employees be compelled to work overtime to bring an FLSA claim; it is enough that the employer suffers or permits the work. Furthermore, Plaintiffs note testimony that Qwest told them during training that they needed to come into work early to boot up their computers and open software applications and saw them performing pre-shift work.

■ Qwest has demonstrated that it had a written policy against off-the-clock work and has pointed out conflicting evidence regarding whether it instructed Consultants to boot up their computers before the start of their shift. There is also consistent evidence that Plaintiffs were, in practice, required to have their computers ready before they logged onto their phone at the start of their shift. The results of the 2005 audit bolster this claim. As to the booting up and shutting down allegations, Plaintiffs have provided substantial evidence of a widespread Qwest policy that, in practice, required off-the-clock work.

As to Plaintiffs' other allegations of off-the-clock work, such as working through meal and lunch breaks and performing other pre- and post-shift tasks, such as customer call backs and reading emails, there is no evidence of a Qwest policy or common practice for those activities. Testimony is widely varying among Plaintiffs regarding whether they ever performed these activities and, if so, how often and which activities. There is no allegation that Qwest instructed them to perform these other activities.

### 3. Employment Settings

■ Plaintiffs must only be similarly situated, not identically situated. *Nerland,*

564 F.Supp.2d at 1018. Plaintiffs argue that, here, they all have the same job descriptions and are subject to the same corporate policies. They all had availability goals and sales quotas and were subject to the same time monitoring policies. They all allege that they worked time for which they were not paid.

Qwest counters that, when plaintiffs are not subject to a common policy or plan requiring off-the-clock work, differences in their employment settings and off-the-clock allegations are more important and warrant decertification.

### a. Variety of Tasks

Qwest argues that discovery has shown that there is no uniform set of tasks that all Plaintiffs claim to have performed off the clock. Various Plaintiffs have claimed performing combinations of the following tasks: cleaning the computer mouse and checking the keyboard; talking with the help desk; pulling orders off the printer; gathering supplies; sending mail to customers; and sending faxes.

Plaintiffs counter that the vast majority of Plaintiffs perform the same off-the-clock tasks on a regular basis: booting up their computer and logging into software programs pre-shift; closing down software applications and shutting down computers post-shift; and making customer callbacks, reading and responding to work-related emails, and completing sales and service orders pre-shift, post-shift, and during breaks. They claim that the fact that a few Plaintiffs testified regarding additional other tasks, such as cleaning a computer mouse or sending faxes, is irrelevant.

■ The Court agrees that, as to Plaintiffs' claims regarding booting up and logging onto and shutting down and logging off of their computers—the booting up and shutting down allegations—, the

record reflects similar activities across the class. As far as other alleged uncompensated activities during break and meal times and other actions taken before and after the end of shift, such as completing sales and service orders, the evidence does not establish similar activities by Plaintiffs.

### b. Amount of Off–the–Clock Time

Qwest notes that Plaintiffs claim widely varying amounts off-the-clock time ranging from one to eleven hours per week. Qwest argues that this wide variation in time weighs in favor of decertification. *See, e.g., Brechler v. Qwest Commc'ns Int'l, Inc.,* No. cv–06–00940–PHX–ROS, 2009 WL 692329, at *3 (D.Ariz. Mar. 17, 2009) (decertifying class and noting that "[t]ime overrun varied between plaintiffs").

Plaintiffs retort that, to the extent the variation in off-the-clock time is an issue, the Court can bifurcate the trial into liability and damages stages or only use expert reports and representative testimony to award damages as a matter of just and reasonable inference under the *Mt. Clemens* standard. *See Anderson v. Mt. Clemens Pottery Co.,* 328 U.S. 680, 687–88, 66 S.Ct. 1187, 90 L.Ed. 1515 (1946) (holding that "where the employer's records are inaccurate or inadequate and the employee cannot offer convincing substitutes … an employee has carried out his burden if he proves that he has in fact performed work for which he was improperly compensated and if he produces sufficient evidence to show the amount and extent of that work as a matter of just and reasonable inference").

■ As to Plaintiffs' booting up and shutting down allegations, the variation in time spent is not significant. Because the same computer systems were used across the class, the reasonable amount of time spent conducting these activities can be established at trial and extrapolated to the

class. As to the other uncompensated tasks asserted by Plaintiffs, the current record reflects that the amount of uncompensated time alleged varies wildly among Plaintiffs. Plaintiffs have offered no clear explanation regarding how these amounts of time can be calculated other than through an individualized inquiry with regard to each class member.

### c. Different Call Centers

Qwest notes that Plaintiffs were employed in dozens of different call centers across various states. Their job duties, performance requirements, and compensation schemes varied depending upon the type of call center and the location in which each Plaintiff worked. Qwest argues that these variations make decertification appropriate. *See Ray v. Motel 6 Operating, Ltd. P'ship*, No. 3–95–828, 1996 WL 938231, at *4 (D.Minn. Mar. 18, 1996) (denying motion for conditional certification when "the members of this proposed class come from different local offices or offices in the company, different geographic locations and different supervisors and salaries.") (citation and internal quotations omitted).

The average time between the first badge swipe into a Qwest facility and the first Total View time stamp varied significantly—from 3.8 minutes in the Pocatello, Idaho facility to 26.0 minutes in the Littleton, Colorado facility—depending on the location in which the individual Plaintiff worked. Additionally, the average time between the last Total View timestamp and the last sales timestamp varied significantly—from 0.6 minutes to 5 minutes—depending on the state in which the Plaintiff worked. Qwest concludes that class certification is inappropriate because the call center's location impacted each Plaintiff's behavior.

Qwest further notes that Plaintiffs worked for hundreds of different managers during the relevant time period, each of whom was individually responsible for monitoring Plaintiffs and implementing Qwest's policy against off-the-clock work. *See Simmons v. T–Mobile USA, Inc.*, Civil Action No. H–06–1820, 2007 WL 210008, at *6 (S.D.Tex. Jan. 24, 2007) (denying conditional certification "where allegedly dozens (if not hundreds) of different low-level supervisors with wide management discretion in practice violate[d] Defendant's clear, lawful written policies" at numerous different locations).

Plaintiffs counter that Qwest's policies and practices are common across all locations, and the Total View system is used nationwide.

 As far as the booting up and shutting down allegations, the variance in locations and managers does not pose an obstacle to certification. There is no evidence that the time it takes to boot up or shut down varies based on location or manager. While there is varying testimony regarding whether particular Consultants were instructed or implicitly forced to boot up and shut down off the clock, overall Plaintiffs argue that it was Qwest's nationwide policy that forced Consultants to perform these activities off the clock.

On the other hand, the amount of time spent on other uncompensated tasks varies significantly, and, as Defendants have pointed out, it varies by location. There is a 22–minute variation in the amount of before-shift time spent at one Qwest location and another location. Additionally, with regard to uncompensated work occurring during breaks and meal times, there is no evidence of a national Qwest policy and, therefore, violations are dependent on the practices of different Qwest managers at different locations.

#### d. Whether Qwest Knew or Should Have Known of Off–the–Clock Work

In order to establish liability, Plaintiffs will have to establish that Qwest knew or should have know that Plaintiffs were working without pay. Qwest argues that, because there is no evidence of a uniform plan or policy, Plaintiffs can only show knowledge on a manager-by-manager basis, and knowledge of off-the-clock work by one manager will not be imputed to other managers. It argues that the need for an individual inquiry into each Plaintiff's claims is exacerbated because Plaintiffs admit that they did not report their claimed off-the-clock work. Qwest asserts that this inquiry will require hundreds, or even thousands, individual credibility determinations between each Plaintiff's testimony and his or her managers' testimony, making certification inappropriate.

Qwest argues that Plaintiffs have not established a pattern of Qwest managers observing off-the-clock work. Some managers testified that when they observed off-the-clock work, they adjusted the Consultant's schedule. Other supervisors testified that they were not aware of Plaintiffs working off the clock, and various Plaintiffs confirmed that their managers were not aware they were working off the clock. Qwest further notes that it did, in fact, take steps in response to the 2005 audit, such implementing training regarding FLSA issues, prohibiting employees from sitting at their desks when they were not working, and providing designated computers for personal use in the break room.

Plaintiffs counter that they have established Qwest's knowledge of their off-the-clock work through routine management observation, the *Moon* litigation and 2005 audit, and Qwest's own records showing that Plaintiffs' actual work time exceeded their scheduled time. Plaintiffs assert that they do not need to show that every supervisor knew every Plaintiff was working off the clock every day. Rather, they must simply establish that Qwest's knowledge of off-the-clock work was sufficiently widespread to be considered a common employment setting.

 The Court agrees that, with respect to the booting up and shutting down allegations, there is clear evidence of Qwest's knowledge of the uncompensated work, arising from the audit, the apparently widespread nature of the practice, and Plaintiffs' argument that, logistically, these activities had to occur off the clock in order to meet Qwest's requirements regarding availability at the beginning and end of shifts. The specter of a thousand mini-trials regarding manager knowledge of this practice is unlikely. However, as to Plaintiffs' other allegations, such as working through mealtimes and breaks and performing additional work tasks before and after their shifts, there is little evidence of a widespread policy or of widespread manager knowledge of these practices. Given the widely varying evidence of how often these practices occurred and to what extent, establishing individual manager knowledge may be necessary.

#### e. Whether Plaintiffs Took Steps to Evade Qwest's Monitoring

 Qwest argues that Plaintiffs' claims are based on alleged work that was performed outside of Qwest's scheduling and monitoring systems and that Plaintiffs took unique steps to avoid Qwest's monitoring. Therefore, any commonalities in Qwest's scheduling system or Mission Control's monitoring system are not relevant to the similarly situated inquiry.

Plaintiffs retort that Qwest can only point to isolated incidents of off-site work. They further argue that on-site work was

not difficult to detect because Plaintiffs and some Qwest supervisors have testified that Qwest knew that Plaintiffs were working off the clock even when not logged into the phone.

The Court concludes that the evidence of Plaintiffs' attempts to actively evade monitoring is sparse and does not weigh heavily in the Court's decision regarding decertification.

**f. Common Pay Policy**

■■■ Plaintiffs argue that they are all subject to a common policy of being paid by their scheduled shift time, instead of by time actually spent working. They assert that this national payroll practice outweighs any differences in Plaintiffs' factual and employment settings. *See Wilks*, 2006 WL 2821700, at *5–*6 (holding that employer's nationally dictated timekeeping and overtime practices, which "applied to each of the plaintiffs, regardless of his or her particular job," weighed in favor of collective action).

Qwest counters that the evidence shows that Qwest's payroll system compensates Consultants for their scheduled time plus all adjustments to reflect actual activities, including overtime.

The Court agrees that Qwest's uniform payroll system weighs in favor of certification. The system does not pay solely based on scheduled time—Consultants can report overtime and receive payment for incidental overtime. However, incidental overtime, as a category, is intended to cover overtime incurred finishing a customer call, not performing the various other off-the-clock activities alleged by Plaintiffs.

**g. Performance of Pre–Shift Work**

■■■ Plaintiffs assert that they typically start working 15 minutes before their shifts and that Qwest management told them that they needed to arrive before their shift in order to boot up their computers and log into their computer systems to be ready to take calls when their scheduled shift began. They argue that they also had to perform other pre-shift work tasks such as making customer call-backs, filling out sales and service orders and reading emails. They assert that White's report bolsters their allegations.

Qwest argues that many Plaintiffs have testified that Qwest never even suggested that Consultants arrive early to start their computers, and some Plaintiffs testified that they were instructed to not work before their shifts. Also, Consultants testified that they arrived early for a variety of reasons, such as carpool or bus schedules and performed different non-work activities, such as getting coffee or chatting with co-workers.

The Court agrees that the full panoply of alleged pre-shift activity is varied and does not appear to be subject to common proof. However, Plaintiffs' allegations that they were required work pre-shift in order to boot up their computers and log in so that they would be ready to take calls at the start of their shifts is an allegation of a common policy or practice that can be shown by common proof.

**h. Uncompensated Work During Breaks and After Shifts**

■■■ Plaintiffs also assert that they similarly performed off-the-clock work during breaks and after their shifts ended. They argue that, while not all Plaintiffs performed significant off-the-clock work after their shifts ended, this slight lack of uniformity does not weigh in favor of decertification.

Qwest notes that numerous Plaintiffs testified that they did not perform off-the-clock work during rest or meal breaks or after their shifts ended.

The Court agrees that the allegations regarding work during rest or meal breaks and after shifts, beyond shutting down their computers, is alleged only by some Plaintiffs and individualized inquiry would be required to determine if such work occurred. The record does not support a common policy or practice with regard to these other allegations.

### 4. Defenses

Qwest asserts that it has numerous, individual defenses to each Plaintiff's claim of off-the-clock work that will overwhelm the focus of any collective trial.

#### a. Length of Workweek and Amount of Hourly Wage

Qwest will assert that, when a Plaintiff did not work more than 40 hours in a given week, the FLSA overtime requirements were not triggered. It further notes that the minimum wage provision requires that an employee be paid no less than the federal minimum wage. 29 U.S.C. § 206(a)(1). However, Qwest asserts that it is highly unlikely that any Plaintiff could claim an hourly wage less than minimum wage given that Plaintiffs' average wage is $18.47 per hour. Based on Qwest's own argument, the resolution of the validity of the minimum wage claim will likely be consistent across all class members.

#### b. No Off–the–Clock Work Performed

Qwest asserts that several Plaintiffs took extended leaves of absence during which it was not possible to work off the clock.

#### c. Tasks Did not Constitute Work

Qwest argues that certain claimed activities, such as cleaning the computer mouse, do not constitute work under the FLSA.

 The Court agrees with Plaintiffs that the question of whether particular activities constitute work are legal questions, which can be resolved on a classwide basis. *See Frank v. Gold'n Plump Poultry, Inc.,* No. 04–CV–1018 (PJS/RLE), 2007 WL 2780504, at *4 (D.Minn. Sept. 24, 2007).

#### d. Off–the–Clock Work Was Compensated

Qwest argues that, in some instances, a Consultant may allege time before his shift that would be included in the Consultant's paid time in the "Start of Tour" Huddle. This defense will address the amount of damages of particular Consultants, but does not affect the allegation that Qwest has a general policy or practice of not paying Consultants for booting up and shutting down their computers. *Cf. Frank,* 2007 WL 2780504, at *4 ("It is true, as Gold'n Plump stresses, that the payment practices of supervisors vary in some respects. For example, some supervisors start paying employees five minutes before they have to be on the line, while other supervisors do not. The varying practices of the supervisors may mean that some employees have less damages than others-or, conceivably, that some employees have no damages at all. But it does not detract from the point that Gold'n Plump has not adopted a corporate policy requiring that employees be paid for donning and doffing time.").

#### e. Unreported Off–the–Clock Work

Qwest notes that Plaintiffs admit that any reported time was paid, so they are only seeking payment for time that they, themselves, failed to report. *See, e.g., Smith v. Micron Elecs., Inc.,* No. CV–01–244–S–BLW, 2005 WL 5336571, at *4 (D.Idaho Feb. 4, 2005) (individualized defense that plaintiffs chose not to report overtime weighs in favor of decertification in off-the-clock case).

Plaintiffs retort that, because Qwest had knowledge of their off-the-clock work in general, it must compensate Plaintiffs for

that work even if they did not make special requests for payment.

### f. Time Bar

Qwest notes that approximately 25% of the 150 Representative Plaintiffs' claims are time barred.

### g. De Minimis Exception

■ Qwest argues that the de minimis exception will apply to small amounts of work irregularly performed. The Court concludes that the de minimis defense is a legal question, properly resolved on a class-wide basis. *See Frank,* 2007 WL 2780504, at *4.

### h. Conclusion

■ The Court concludes that, overall, most of Qwest's defenses are either legal questions that can be resolved on a class-wide basis or defenses that relate to the amount of damages, not liability. The Court agrees that there are some defenses asserted by Qwest that will require individualized inquiry—such as whether a particular Plaintiff's claims are time barred. Overall, however, the defenses mentioned by Qwest weigh in favor of certification.

### 5. Fairness and Procedural Concerns

Qwest argues that, because there is no common illegal policy or plan, "the case will have enormous manageability problems." *Proctor v. Allsups Convenience Stores, Inc.,* 250 F.R.D. 278, 281 (N.D.Tex. 2008) (citation omitted). Trial will require individualized inquiry into whether each particular Plaintiff performed off-the-clock work and whether Qwest knew or should have known of that unpaid work. Qwest highlights the burden of reviewing individual witnesses for each of the Plaintiffs.

Plaintiffs emphasize that decertification would be contrary to the remedial purposes of the FLSA collective action:

(1) to lower costs to the plaintiffs through the pooling of resources; and (2) to limit the controversy to one proceeding which efficiently resolves common issues of law and fact that arose from the same alleged activity.

*Moss v. Crawford & Co.,* 201 F.R.D. 398, 410 (W.D.Pa.2000) (citing *Hoffmann–La Roche, Inc. v. Sperling,* 493 U.S. 165, 170, 110 S.Ct. 482, 107 L.Ed.2d 480 (1989)).

Plaintiffs assert that this collective action will lower their individual costs of pursuing their claims and note that, without the ability to proceed collectively, many Plaintiffs would be unable to afford the cost of pursuing their own claims. Plaintiffs claim that, likewise, Qwest will save significant time and money by allowing the matter to be decided once. They argue that it would be inefficient to try the same issues regarding Total View and the experts' testimony in individual cases.

The Court concludes that, to the extent Plaintiffs' claims are based on allegations of uncompensated time spent booting up and logging onto their computers in order to be ready to take calls at the start of their shifts and of shutting down or logging off of their computers after the end of their shifts, a collective action would be manageable and preferable. These claims are based on an allegation of a widespread similar practice; they are based on discrete tasks that are susceptible to common proof; the amount of time it takes to complete these tasks is unlikely to greatly vary among Plaintiffs; and there is no allegation that the need to perform these tasks or the time it takes to perform these tasks varies based on geographic location or a particular manager. The Court does not foresee the need for a multitude of mini-trials with regard to these allegations.

On the other hand, the Court concludes that a collective action is not manageable with regard to Plaintiffs' remaining allega-

tions. The claims of uncompensated work during meal times, breaks, or before or after shifts that are unrelated to booting up and shutting down vary enormously among Plaintiffs. There is no allegation of a general practice or policy. Some Plaintiffs do not allege these types of uncompensated work, while others do. The amount of time allegedly spent on these diverse activities is widely varying among Plaintiffs. There is also variance by location. For instance, the time between swiping into the Qwest facility and commencing the shift shows material variance based on location. To determine liability for these types of uncompensated work, the parties would need to engage in mini-trials for each Plaintiff. Moreover, representative testimony would not be appropriate in this case because there are widely varying allegations. *See, e.g., Proctor,* 250 F.R.D. at 284 (holding representative testimony is inappropriate when "there is no consistency among the testimony, there is no consistently applied policy resulting in working off the clock, and the time spent working off the clock is not alleged to be uniform or of a predetermined duration"). Plaintiffs's suggestion of bifurcating the FLSA case into a liability and a damages stage does not address the manageability problems because individualized inquiry is required to determine liability, not just damages.

▉▉▉ Finally, the Court rejects Qwest's assertion that the FLSA class cannot be effectively tried alongside the requested state law classes. The Court does not find a fundamental barrier to effectively trying Rule 23 class actions and an FLSA collective action together, so long as the classes themselves are limited to the booting up and shutting down allegations. *See, e.g., Salazar v. Agriprocessors, Inc.,* 527 F.Supp.2d 873, 887 (N.D.Iowa 2007) (finding that judicial economy, convenience, and fairness favored trying plaintiffs' state wage claim and FLSA claim together).

### C. Conclusion

Overall, the Court concludes that a collective action is appropriate and manageable with regard to Plaintiffs who allege FLSA violations based on the booting up and shutting down of their computers. Any necessary logging on and logging off is including in these tasks. Although Qwest has provided evidence that not all Consultants engaged in uncompensated booting up and shutting down, Plaintiffs have provided evidence that the practice was widespread and generally uniform. The amount of time spent will generally be similar across Plaintiffs and representative testimony should be sufficient to establish whether or not this practice occurred and was permitted by Qwest. These are the allegations that were at the heart of the Court's original conditional certification Order. However, the Court's analysis has demonstrated that Plaintiffs who allege FLSA violations based on the hodgepodge of other uncompensated activities are not a cohesive group of Plaintiffs with a common set of claims that would be conducive to a collective action.

▉▉▉ Rather than determining that the combination of allegations requires the Court to decertify the FLSA class, the Court concludes that the better course of action is to deny decertification as to a class consisting of persons pursuing FLSA violations based on the uncompensated pre- and post-shift work of booting up and shutting down their computers. This class is consistent with the allegations that formed the core of Plaintiffs' original conditional certification motion and this Court's conditional certification Order. It is within the Court's discretion to clarify and narrow the proposed class in this way in order to ensure that the certified class

is consistent with the purposes and requirements of the FLSA. *See, e.g., Baldridge v. SBC Commc'ns, Inc.*, 404 F.3d 930, 931–32 (5th Cir.2005) (noting court's discretion to modify scope of FLSA class); *Bouaphakeo v. Tyson Foods, Inc.*, 564 F.Supp.2d 870, 900 (N.D.Iowa 2008) (holding that "it is well within the court's discretion to refine Plaintiffs' proposed [FLSA] collective action class") (citation omitted).

## IV. PLAINTIFFS' MOTION FOR CERTIFICATION OF THE STATE LAW CLAIMS

Plaintiffs move for Rule 23 certification of classes for four states: Minnesota, Colorado, Oregon, and Washington.

### A. Standard for Class Certification Under Rule 23

The class action serves to conserve the resources of the court and the parties by permitting an issue that may affect every class member to be litigated in an economical fashion. *Gen. Tel. Co. of the Southwest v. Falcon*, 457 U.S. 147, 155, 102 S.Ct. 2364, 72 L.Ed.2d 740 (1982). Whether an action should be certified as a class action is governed by Rule 23 of the Federal Rules of Civil Procedure.

To be certified as a class, plaintiffs must meet all of the requirements of Rule 23(a) and must satisfy one of the three subsections of Rule 23(b). The Rule 23(a) requirements for class certification are: (1) the putative class is so numerous that it makes joinder of all members impractical; (2) questions of law or fact are common to the class; (3) the class representatives' claims or defenses are typical of the claims or defenses of the class; and (4) the representative parties will fairly and adequately protect the interests of the class.

*In re St. Jude Med., Inc.*, 425 F.3d 1116, 1119 (8th Cir.2005) (citing Fed.R.Civ.P. 23(a)) (footnote and other citations omitted).

Rule 23(b)(3) allows a class action when "the court finds that the questions of law or fact common to class members predominate over any questions affecting only individual members, and that a class action is superior to other available methods for fairly and efficiently adjudicating the controversy." Plaintiffs do not seek certification under any of the other Rule 23(b) categories.

### B. Class Definitions

Qwest asserts that Plaintiffs have failed to adequately define their proposed classes. In their Reply, Plaintiffs have addressed Qwest's objection and have defined the following five subclasses:

1) All individuals who are or were employed by Defendants in Minnesota as Sales Consultants and/or Sales and Service Consultants at Defendants' Small Business and/or Consumer Call Centers between August 30, 2003 and the present.

2) All individuals who are or were employed by Defendants in Colorado as Sales Consultants and/or Sales and Service Consultants at Defendants' Small Business and/or Consumer Call Centers between April 10, 2005 and the present.

3) All individuals who are or were employed by Defendants in Oregon as Sales Consultants and/or Sales and Service Consultants at Defendants' Small Business and/or Consumer Call Centers between April 10, 2005 and the present.

4) All individuals who are or were employed by Defendants in Washington as Sales Consultants and/or Sales and Service Consultants at Defendants' Small Business and/or Consumer Call Centers

between December 17, 2004 and the present.

5) Washington Wage Withholding Claim (RCW 49.48.010): All former employees employed by Defendants in Washington as Sales Consultants and/or Sales and Service Consultants at Defendants' Small Business and/or Consumer Call Centers between December 17, 2004 and the present.

(Reply at 2.)

■ As the Court has explored in detail with regard to the FLSA claim, to the extent that Plaintiffs seek collective action based on allegations of working during meal times or breaks or before and after shifts for reasons other than booting up or shutting down their computers, the Court finds that a collective action would be unmanageable and dominated by individualized inquiries. The lack of a common policy or practice of off-the-clock work in these situations, coupled with variance among individual class members regarding whether they performed such tasks at all, let alone for similar amounts of time, makes class certification inappropriate.

However, the Court also concludes that certification of narrower classes based on the booting up and shutting down allegations would fit within Rule 23. Therefore, the Court will conduct its analysis with regard to those narrower classes. The Court is within its discretion to narrow the proposed classes in order to comport with Rule 23. *See, e.g., In re Katrina Canal Litig. Breaches,* 524 F.3d 700, 712 n. 48 (5th Cir.2008) ("A district court is given broad discretion in controlling class actions because of the managerial difficulties which may develop.... [T]he district court may only take those parts of a lawsuit which lend themselves to convenient use of the class action motif.") (quoting *Nix v. Grand Lodge of Int'l Ass'n of Mach. & Aerospace Workers,* 479 F.2d 382, 385 (5th

Cir.1973)); *Powers v. Hamilton County Public Defender Comm'n,* 501 F.3d 592, 619 (6th Cir.2007) ("[C]ourts must be vigilant to ensure that a certified class is properly constituted. More to the point, district courts have broad discretion to modify class definitions...."): *Gwiazdowski v. County of Chester,* 263 F.R.D. 178, 184 (E.D.Pa.2009) (modifying class definition to only include one of two strip search policies that were the basis of plaintiff's proposed class definition).

## C. Rule 23(a) Requirements

### 1. Numerosity

■ The Court concludes that Plaintiffs have sufficiently shown that the proposed class members are "so numerous that joinder of all members is impracticable." Fed.R.Civ.P. 23(a)(1). Qwest's list of all Small Business and Consumer call center workers nationwide from August 30, 2003 until August 2007 includes approximately 6,700 individuals—approximately 700 in the Minnesota class, 900 in the Colorado class, 400 in the Oregon class, and 300 in the Washington classes.

### 2. Commonality

■ With respect to the redefined classes, Plaintiffs have met the commonality requirement because Plaintiffs claim they were forced to work off the clock because of Qwest's general policy, monitoring systems, and reporting practices. They claim that Qwest's particular system of starting shift time based on being logged into the telephone and being ready to take calls, even though employees must boot up in order to be ready for the start of shift and must shut down after logging out of the telephone, creates widespread state law overtime violations.

On the other hand, as the Court has previously explained, commonality does

not exist with regard to the other off-the-clock allegations in Plaintiffs' proffered class definitions where there is starkly conflicting evidence from potential class members regarding whether wage and hour violations occurred. *See, e.g., Garcia v. Sun Pac. Farming Co-op.,* No. CV F 06–0871 LJO TAG, 2008 WL 2073979, at *12 (E.D.Cal. May 14, 2008) ("The Court finds that due to the conflicting evidence on the very wage and hour violations alleged in the complaint, within and among the various crews, the plaintiffs have not shown commonality.").

### 3. Typicality

"[A] class representative must be part of the class and possess the same interest and suffer the same injury as the class members." *Gen. Tel. Co. of the Southwest,* 457 U.S. at 156, 102 S.Ct. 2364 (citation omitted). "This requirement is generally considered to be satisfied if the claims or defenses of the representatives and the members of the class stem from a single event or are based on the same legal or remedial theory." *Paxton v. Union Nat'l Bank,* 688 F.2d 552, 561–62 (8th Cir.1982) (citations omitted). "The burden is fairly easily met so long as other class members have claims similar to the named plaintiff. Factual variations in the individual claims will not normally preclude class certification if the claim arises from the same event or course of conduct as the class claims, and gives rise to the same legal or remedial theory." *Alpern v. UtiliCorp United, Inc.,* 84 F.3d 1525, 1540 (8th Cir. 1996) (citations omitted).

### a. General Typicality Discussion

■■ Qwest asserts that the named Plaintiffs are not typical because some proposed class members have submitted declarations that they do not have claims against Qwest for the state law violations. Under the Court's modified class definitions, these conflicts are not significant

enough to defeat typicality. Plaintiffs have met the typicality requirement because Qwest's monitoring and compensation practices and computer and phone log in systems apply to all Plaintiffs and putative class members. These systems, combined with an alleged nationwide policy that Consultants be ready to accept calls at the start of their shifts, allegedly resulted in violations of state wage laws, and putative class members have alleged claims from their respective states.

### b. Standing Arguments

■■ Qwest also asserts that the named Plaintiffs fail to allege facts sufficient to support standing. "A plaintiff has the burden of establishing subject matter jurisdiction, for which standing is a prerequisite." *Jones v. Gale,* 470 F.3d 1261, 1265 (8th Cir.2006) (citations omitted).

> To establish standing, a plaintiff is required to show that he or she had suffered an injury in fact, meaning that the injury is (a) concrete and particularized and (b) actual or imminent, not conjectural or hypothetical. Second, the injury must be traceable to the defendant's challenged action. Third, it must be likely rather than speculative that a favorable decision will redress the injury.

*Id.* (citations omitted).

Qwest argues that, for example, none of the named Plaintiffs in Minnesota allege any facts to support a Minnesota minimum wage violation. Plaintiffs claim that Plaintiffs have alleged a claim under each asserted state claim. At least one named Plaintiff has sufficiently alleged each claim. *See Nerland,* 564 F.Supp.2d at 1033 ("[I]f the action is brought by more than one named plaintiff, it only is necessary that one of them be a qualified member of the class as long as the other prerequisites of Rule 23(a) are satisfied.") (citations omitted).

The pertinent question is whether named Plaintiffs have alleged a claim under each state law count. *See, e.g., Great Rivers Co-op. of Se. Iowa v. Farmland Indus., Inc.,* 120 F.3d 893, 899 (8th Cir. 1997) ("Here, Tacey is not and cannot be a class member because his claim is time barred; consequently, he cannot represent the class. Because Tacey is the only named representative in Count 4, the putative class lacks a representative on that count. Without a class representative, the putative class cannot be certified and its claims cannot survive.") (citations omitted). The Court addresses each claim below.

### c. Particular Claims

#### i. Minnesota Overtime Claim

■ Minnesota overtime law only applies to workweeks over 48 hours. Minn. Stat. § 177.25, subd. 1. Plaintiffs assert that, according to Qwest's records, Plaintiff Matthew Burch worked 45.67 hours the week of March 15, 2004, and testified that he worked an average of 5.25 of off-the-clock hours per week. Plaintiffs conclude that, therefore, Burch worked over 48 hours at least one week and has an overtime claim under Minnesota law. Qwest argues that Burch testified that he is not claiming that he worked more than 48 hours a week, as required to sustain a claim under Minnesota's overtime law. Plaintiffs assert that Burch's testimony on this point is ambiguous: Q: "You are not claiming that you worked 48 hours a week, are you?" A. "No." (M. Burch Dep. 57.)

Burch's quoted testimony is ambiguous. It is unclear whether he meant that he did not regularly work 48–hour weeks or whether he meant that he had never worked a 48–hour week. Combined with Plaintiffs' evidence that Burch worked at least one week for more than 48 hours, the Court concludes that, at this point, he alleges a Minnesota overtime that states a

claim and is, therefore, typical for purposes of Rule 23.

#### ii. Minnesota Minimum Wage Claim

Qwest reasons that, to state a claim for a violation of the Minnesota minimum wage, Plaintiffs must show that their total weekly compensation divided by their total weekly hours would be less than the minimum wage. According to Qwest's expert, Plaintiffs would need to have worked an average of more than 69 hours off the clock each week, in order to state a claim for a minimum wage violation.

Plaintiffs assert that by failing to pay Plaintiffs for all hours worked, they paid a wage of $0 per hour for certain hours, violating Minnesota's minimum wage law. Plaintiffs argue that Qwest's method of dividing salary by the number of hours worked in a week to determine whether the per-hour wage met the minimum wage is improper because it would allow Defendant to borrow wages already paid and apply them to hours for which Plaintiffs were not paid at all. Plaintiffs assert that, under Qwest's reasoning, Plaintiffs who worked less than 48 hours per week have no recourse for off-the-clock work under state law because Minnesota law does not require overtime compensation under 48 hours worked per week. However, Minnesota law provides that "minimum wage must be paid for all hours worked." Minn. R. 5200.0120.

Qwest's argument goes to the merits of Plaintiffs' minimum wage claim. At this stage, the Court does not need to decide the disposition of this claim. The interpretation of the minimum wage statute will be a question of law common to all class members. There is no question that the Minnesota representatives are in the same position with regard to this issue as the class they seek to represent. Therefore, their claims are typical, even if, under Qwest's interpretation, the claims of both

the representatives and the putative class members will fail.

### iii. Minnesota Meal and Rest Break Claim

Plaintiffs do not move for class certification on rest breaks under Minnesota law. (Reply at 5 n. 6.) As previously explained, the Court has determined that the meal break claim will not be included in the modified class definition.

### iv. Minnesota Record Keeping Claim

Plaintiffs assert that Qwest violated Minnesota Statute § 177.30 by not making and keeping a record of time spent by class members working off the clock. The proposed Minnesota class representatives' claims are typical of the class with regard to this issue. If, as Qwest argues, the representatives' claim under this statute is insufficient under Minnesota law, all class members' claims will similarly be insufficient. The Court will not address the merits of Qwest's argument at this stage.

### v. Colorado Overtime Claim

Plaintiff David Howard has standing and a typical Colorado overtime claim because he alleges that he worked more than his scheduled time without compensation, in violation of Colorado overtime requirements and recordkeeping requirements. Colorado requires overtime for more than 40 hours in a workweek or 12 hours in a day. *See* Co. Minimum Wage Orders 22, 25. Other Colorado class members lodge similar allegations.

### vi. Colorado Meal Break Claim

As previously explained, the Court has determined that the meal break claim will not be included in the modified class definition.

### vii. Oregon Overtime Claim

■ Plaintiff Ronald Schneberger alleges that he did not receive overtime compensation for the time he worked before or after his scheduled shift. Other class representatives made the same allegations. Oregon overtime law applies to work performed in excess of a forty hour workweek. Or. Admin. R. 839-020-0030. Schneberger's claim is typical of the class allegations, and he has standing to assert this claim.

### viii. Oregon Meal and Rest Break Claims

Plaintiffs have withdrawn their motion for class certification as to Oregon meal and rest break claims. (Reply at 6 n. 7.)

### ix. Washington Overtime Claim

■ Plaintiff Gena Margason alleged working overtime—more than 40 hours in a week—without pay. Other class representatives also alleged working overtime without compensation. Washington overtime law applies to hours worked in excess of 40 hours in a workweek. Wash. Rev. Code. § 49.46.130. Margason has standing to assert this claim and her claim is typical of the proposed class.

### x. Washington Withholding Claim

The Washington withholding statute applies to former employees. Wash Rev. Code. § 49.48.010. Margason is a former employee. Therefore, she has standing to bring this claim and is typical of those former employees who would assert this claim.

### xi. Washington Meal and Rest Break Claim

As previously explained, the Court has determined that the meal and rest break claims will not be included in the modified class definition.

### 4. Adequacy

■ "The focus of Rule 23(a)(4) is whether: (1) the class representatives have common interests with the members of the class, and (2) whether the class

representatives will vigorously prosecute the interests of the class through qualified counsel." *Paxton,* 688 F.2d at 562–63 (citations omitted).

The Court has reviewed the evidence submitted by Plaintiffs' counsel and concludes that Nichols Kaster, PLLP, is experienced and qualified to litigate this matter.

There is no evidence that the named Plaintiffs have not willingly and adequately participated in the litigation. Qwest objects that the named Plaintiffs have not suffered the same injuries as other class members. The Court has already addressed those arguments. Therefore, the Court concludes that Plaintiffs have met the adequacy prong.

### D. Rule 23(b) Test

### 1. Whether Common Questions of Law or Fact Predominate

The nature of the evidence that will suffice to resolve a question determines whether the question is common or individual. If, to make a prima facie showing on a given question, the members of a proposed class will need to present evidence that varies from member to member, then it is an individual question. If the same evidence will suffice for each member to make a prima facie showing, then it becomes a common question.

*Blades v. Monsanto Co.,* 400 F.3d 562, 566 (8th Cir.2005) (citations omitted).

Plaintiffs assert that the same evidence of Qwest's common practice of discouraging its employees from reporting or failing to notify employees to report overtime will be used to determine Qwest's liability. Under the modified class definitions, Plaintiffs assert the same reasons for working off-the-clock—that Qwest requires Plaintiffs to arrive early to log into the computer systems so that they are ready to take calls the moment their shifts begin, and Plaintiffs were required to shut down their computers and log out of several computer applications after the end of their shifts.

 Under the modified class definitions, common questions of law and fact will predominate. Because the Court has narrowed the classes to those based solely on allegations regarding the practice of booting up and shutting down the computers before and after shifts, the predominate questions will be whether these actions existed as a widespread Qwest policy or practice; whether Qwest knew of the practice; whether the actions were completed before and after shift; and how long these activities take.

Because the alleged uncompensated activity consists of almost identical actions by employees, regardless of geographic location or particular supervisors, the case will not face the type of obstacles that were addressed in *Babineau v. Federal Express Corp.,* cited by Qwest. 576 F.3d 1183 (11th Cir.2009). In *Babineau,* the Eleventh Circuit held that certification was inappropriate for the "gap times" between manual punch in and the scheduled start time and for breaks because individualized inquiries would need to be made into the activities of each plaintiff during those times. While, under Plaintiffs' original class definitions, the same type of individualized inquiries would have to have been made, under the modified class definitions, the class questions will now focus on the common activities of booting up and shutting down.

### 2. Superiority

 As the Court explained with regard to the FLSA claim, the significant manageability concerns raised by Plaintiffs' original class definitions are solved by the Court's modified class definitions. By focusing only on the booting up and shut-

ting down claims, the ultimate trial of this case will focus on two limited activities which are universally performed across the class. It would be inefficient to require class members to try these claims individually in various courts across the country, seeking relatively small recoveries.

The Rule 23(b)(3) factors support certification:

(A) the class members' interests in individually controlling the prosecution or defense of separate actions;

(B) the extent and nature of any litigation concerning the controversy already begun by or against class members;

(C) the desirability or undesirability of concentrating the litigation of the claims in the particular forum; and

(D) the likely difficulties in managing a class action.

Class members have little interest in individually controlling this litigation because the remaining class issues before the Court are practically identical. It will be efficient to center the litigation of these limited claims in one forum. This Court has managed this action for more than two years. Litigation of these two limited activities does not pose insurmountable management issues.

In sum, the Court grants Plaintiffs' motion for certification of the modified state law classes.

### E. Preemption

In addition to their briefs, Qwest filed a Notice of Supplemental Authority citing to *Zupancich v. U.S. Steel Corp.*, Civil No. 08–5847 ADM/RLE, 2009 WL 1474772 (D.Minn. May 27, 2009). In deciding a motion to dismiss, the *Zupancich* court determined that the plaintiffs' MFLSA claim was preempted by the Labor Management Relations Act because the claim was "inextricably intertwined with the

CBA [collective bargaining agreement]." *Id.* at *3. Qwest asserts that, here, too, Plaintiffs' state law claims are preempted by the CBA.

■■■ Discussion of preemption is inappropriate at this point because "[i]n determining the propriety of class action certification, the question is not whether the plaintiffs have stated a cause of action or will ultimately prevail on the merits, but rather whether the requirements of Rule 23 are met." *Midwestern Machinery v. Northwest Airlines, Inc.*, 211 F.R.D. 562, 569 (D.Minn.2001) (citing *Eisen v. Carlisle & Jacquelin*, 417 U.S. 156, 178, 94 S.Ct. 2140, 40 L.Ed.2d 732 (1974)). Moreover, Qwest has not filed a motion to dismiss or fully briefed this issue but, instead, inappropriately relies on a Notice of Supplemental Authority to assert an entirely new legal argument. In any event, if preemption applies, it will apply equally to the class; therefore, the named Plaintiffs' claims are typical and common legal issues will predominate.

## V. MOTION FOR PARTIAL SUMMARY JUDGMENT

### A. Summary Judgment Standard

Summary judgment is appropriate if, viewing all facts in the light most favorable to the non-moving party, there is no genuine issue as to any material fact, and the moving party is entitled to judgment as a matter of law. Fed.R.Civ.P. 56(c); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322–23, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). The party seeking summary judgment bears the burden of showing that there is no disputed issue of material fact. *Celotex*, 477 U.S. at 323, 106 S.Ct. 2548. Summary judgment is only appropriate when "there is no dispute of fact and where there exists only one conclusion." *Crawford v. Run-*

*yon,* 37 F.3d 1338, 1341 (8th Cir.1994) (citation omitted).

Plaintiffs move for partial summary judgment consisting of findings that 1) Qwest is liable under the FLSA for claims of overtime wages for off-the-clock work; 2) Qwest is liable under the FLSA for liquidated damages; and 3) Qwest willfully violated the FLSA, such that the three-year statute of limitations applies.

### B. Whether Qwest Violated the FLSA by Paying Plaintiffs Based on Scheduled Time Instead of on Actual Time Worked

Qwest first asserts that Plaintiffs' motion is premature because the Court should consider the two motions regarding class certification before it considers dispositive motions. The Court has addressed this concern by deciding the class certification motions before the dispositive motions within the same order. *See, e.g., Beckmann v. CBS, Inc.,* 192 F.R.D. 608, 612 (D.Minn.2000).

#### 1. Legal Standard for FLSA Overtime Liability

"Under the FLSA, 'it shall be unlawful for any person' to violate the minimum wage, overtime, and recordkeeping provisions of that statute. 29 U.S.C. § 215(a)(2),(5). Employees who are 'engaged in the production of goods for commerce' are entitled to overtime compensation for working more than forty hours in a week. *See id.* § 207(a)." *Reich v. Stewart,* 121 F.3d 400, 404 (8th Cir.1997).

An employee must be compensated for duties before and after scheduled hours ... if the employer knows or has reason to believe the employee is continuing to work and the duties are an integral and indispensable part of the employee's principal work activity. Thus, in order to prevail on their overtime claims, Plaintiffs [a]re required to present evi-

dence that they worked above their scheduled hours without compensation and that the [employer] knew or should have known that they were working overtime.

*Hertz v. Woodbury County, Iowa,* 566 F.3d 775, 781 (8th Cir.2009) (citations omitted).

Plaintiffs assert that they must establish the amount of off-the-clock work as a matter of "just and reasonable inference." *Anderson v. Mt. Clemens Pottery Co.,* 328 U.S. 680, 687–88, 66 S.Ct. 1187, 90 L.Ed. 1515 (1946).

[W]here the employer's records are inaccurate or inadequate and the employee cannot offer convincing substitutes ... an employee has carried out his burden if he proves that he has in fact performed work for which he was improperly compensated and if he produces sufficient evidence to show the amount and extent of that work as a matter of just and reasonable inference. The burden then shifts to the employer to come forward with evidence of the precise amount of work performed or with evidence to negative the reasonableness of the inference to be drawn from the employee's evidence. If the employer fails to produce such evidence, the court may then award damages to the employee, even though the result be only approximate.

*Id.* (citation omitted).

Plaintiffs argue that there is no genuine issue of material fact regarding any of the prima facie factors.

#### 2. Existence of Off–the–Clock Work

■ At this stage of the litigation, Plaintiffs cannot establish, as a matter of law, that they performed any uncompensated work because Plaintiffs' testimony attesting to off-the-clock work is contradicted by testimony of other Plaintiffs and by the testimony of Qwest managers.

Plaintiffs' own expert concedes that he could not determine if Plaintiffs were performing compensable work outside of their regular shifts. Qwest's records show that some Consultants arrived before their shifts and left after their shifts. The records do not indisputably establish that Plaintiffs performed compensable work outside of their shifts. *See Mt. Clemens Pottery, Co.*, 328 U.S. at 690, 66 S.Ct. 1187 ("[I]t is generally recognized that time clocks do not necessarily record the actual time worked by employees."). At a minimum, there are genuine issues of material fact precluding summary judgment.

### 3. Whether Qwest Suffered or Permitted Off–the–Clock Work

■■■ Additionally, even if Plaintiffs can show that some Plaintiffs did perform off-the-clock compensable work, they cannot show, as a matter of law, that Qwest suffered or permitted that work. Under the FLSA, "[w]ork not requested but suffered or permitted is work time." 29 C.F.R. § 785.11. Work has been suffered or permitted if the employer "knows or has reason to believe" that the work was being performed. *Id.; Stewart*, 121 F.3d at 407. Plaintiffs must establish "a pattern or practice of employer acquiescence to such work," because only identifying a few instances of off-the-clock work is insufficient to establish that the work was suffered or permitted. *See Pforr v. Food Lion, Inc.*, 851 F.2d 106, 109 (4th Cir.1988) ("[A] plaintiff must show by actual knowledge or by a pattern and/or practice that the employer 'suffered' or allowed the off-the-clock work claimed. This proof may be developed as a 'just and reasonable inference' from the evidence.").

Plaintiffs argue that Qwest had constructive knowledge of their off-the-clock work based on Qwest's own electronic records; Qwest's company policy; observations by Qwest supervisors; and the *Moon* litigation and subsequent audit.

### a. Qwest's Own Electronic Records

Plaintiffs assert that Qwest admittedly has a company policy of paying Plaintiffs based on their schedules, rather than on actual work time. They further argue that, based on Qwest's Total View records, it is apparent that Plaintiffs' actual time worked was greater than the scheduled time for which they were paid. Qwest's own expert, Curry, admitted that it was possible that Plaintiffs performed unpaid, yet compensable, work.

Plaintiffs argue that Qwest had contemporaneous knowledge of the incidental overtime worked, and yet chose to ignore that knowledge and even deny payment for incidental overtime if the work was not reported until the next day.

Plaintiffs note evidence that Qwest instructed employees in training that they were required to come in before their shifts in order to prepare to accept calls. They argue that employees conducted pre-shift, post-shift, and lunch break activities for the benefit of Qwest, such as logging into their computers and shutting down software programs and their computers.

Qwest has provided evidence that it has paid its Consultants all reported overtime; and there is evidence from both managers and Plaintiffs that no managers instructed Consultants to perform off-the-clock work. The questions of whether, in fact, Plaintiffs, as a class, performed uncompensated work, Qwest was aware of that widespread fact, and Qwest's overtime system, as Plaintiffs' claim, in practice did not permit the reporting of booting up and shutting downtype overtime, are left to the factfinder.

### b. Qwest's Payment Policy

Plaintiffs conclude that it is a per se violation of the FLSA for employers to pay their employees based on scheduled time, rather than for time actually worked, when the practice results in a failure to fully compensate employees for all of the time that they have worked. They argue that, in this case, Qwest's payroll system is based on scheduled time, not actual time worked, and does not include the time a worker logs into his or her computer, even when that time is before the scheduled shift start.

There are genuine issues of material fact regarding the significance of Qwest's payment system. There is evidence in the record that Plaintiffs are paid based on the scheduled time, as adjusted by reported overtime, among other things. Additionally, White admits that the electronic records do not show what activities Plaintiffs were performing during the alleged off-the-clock times.

### c. Observations by Qwest Supervisors

Plaintiffs claim that many of Qwest's supervisors had either actual or constructive knowledge that Plaintiffs were performing uncompensated work because they observed Plaintiffs working off the clock. Plaintiffs conclude that the supervisors knew or could have discovered that uncompensated work was being performed if they had acted with reasonable diligence.

"[T]he relevant question is not whether a specific supervisor knew . . . but rather whether the circumstances were such that Qwest, as the employer, knew or should have know that off-the-clock work was occurring." *Brennan v. Qwest Commc'ns Int'l, Inc.*, Civil No. 07–2024 ADM/JSM, 2009 WL 1586721, at *6 (D.Minn. June 4, 2009). Here, some Plaintiffs admit that their managers did not know they were working off the clock or merely surmise that their managers observed them working off the clock.

While Plaintiffs' evidence of their supervisors' knowledge is certainly valid, it is insufficient to establish constructive knowledge as a matter of law. *See, e.g., Hertz v. Woodbury County, Iowa*, No. 06 CV 4083, 2008 WL 2095553, at *6 (N.D.Iowa May 16, 2008) (denying plaintiffs' summary judgment motion because of "apparent factual dispute as to defendant's knowledge and duty to inquire" even though employer had access to plaintiffs' on-duty records), aff'd 566 F.3d 775 (8th Cir.2009).

### d. The *Moon* Litigation and Subsequent 2005 Audit

Plaintiffs argue that the results of the 2005 audit put Qwest on notice of potential FLSA compliance issues. For instance, the audit team noted that employees generally logged into their computers before the start of their scheduled shift. Plaintiffs claim that, after the audit, Qwest failed to take adequate steps to ensure that it was paying Plaintiffs for all hours worked.

Qwest argues that the 2005 audit was limited in scope and did not provide any conclusive evidence that the Consultants were working uncompensated time. *See In re Food Lion Effective Scheduling Litig.*, 861 F.Supp. 1263, 1274 (E.D.N.C.1994) (holding that previous lawsuits, a Department of Labor investigation, and an FLSA compliance agreement did not establish employer's knowledge when the evidence "was insufficient to show that these individual experiences from such a limited area represented the norm"). Even if the audit identified actual instances of off-the-clock work, it would still not establish undisputed knowledge as a matter of law for the entire class of Plaintiffs. The weight to be given the 2005 audit is for the factfinder.

## C. Conclusion

The Court denies Plaintiffs' motion for partial summary judgment. Plaintiffs have presented evidence of a common practice of off-the-clock work before and after shifts made mandatory by the logistics of being ready to take calls at shift start and the need to meet availability requirements. They have even presented some evidence that supervisors instructed Plaintiffs to boot up their computers before logging into their phones. However, the latter evidence is sporadic, even among Plaintiffs' testimony, and the former evidence is contradicted by evidence from other Consultants and from supervisors. There are also genuine issues of material fact regarding whether Qwest suffered off-the-clock work. It is for the jury to weigh Plaintiffs' evidence of testimony of off-the-clock work and their argument that, as a matter of common sense, Consultants needed to have their computers ready before they took their first call, necessitating off-the-clock boot-up time, against the contradictory testimony that some Consultants logged into their phones and then placed the phone on unavailable status while they logged into their computers and that other Consultants simply started the computers while on their first call. These credibility determinations are for a jury to decide.

■ Because the Court concludes that Plaintiffs are not entitled to summary judgment on liability, the Court also denies their request for summary judgment on the issues of willfulness and liquidated damages. *See Carlson v. C.H. Robinson Worldwide, Inc.*, Nos. CIV. 02–3780 (JNE/JGL), CIV. 02–4261 (JNE/JGL), 2005 WL 758601, at *15 (D.Minn. Mar. 30, 2005) ("[U]nder the FLSA, liability is a predicate to a willfulness analysis and to a finding of liquidated damages.").

Accordingly, based upon the files, records, and proceedings herein, **IT IS HEREBY ORDERED** that:

1. Defendants' Motion for Decertification of Conditional Class [Docket No. 306] is **DENIED** and the following FLSA class remains certified: Individuals who worked as Sales Consultants and/or Sales and Service Consultants at a Qwest Call Center during the past three years who have performed the activities of booting up their computers and logging onto their computer programs before the start of their shifts and/or the activities of logging out of their computer programs and/or shutting down their computers after the end of their shifts and were not compensated for those activities.

2. Plaintiffs' Motion in Support of Class Certification [Docket No. 312] is **GRANTED** and the following subclasses are certified:

 a) All individuals who are or were employed by Defendants in Minnesota as Sales Consultants and/or Sales and Service Consultants at Defendants' Small Business and/or Consumer Call Centers between August 30, 2003 and the present and who, during that time, have performed the activities of booting up their computers and logging onto their computer programs before the start of their shifts and/or the activities of logging out of their computer programs and/or shutting down their computers after the end of their shifts and were not compensated for those activities.

 b) All individuals who are or were employed by Defendants in Colorado as Sales Consultants and/or Sales and Service Consultants at Defendants' Small Business and/or Consumer Call Centers between April 10, 2005 and

the present and who, during that time, have performed the activities of booting up their computers and logging onto their computer programs before the start of their shifts and/or the activities of logging out of their computer programs and/or shutting down their computers after the end of their shifts and were not compensated for those activities.

c) All individuals who are or were employed by Defendants in Oregon as Sales Consultants and/or Sales and Service Consultants at Defendants' Small Business and/or Consumer Call Centers between April 10, 2005 and the present and who, during that time, have performed the activities of booting up their computers and logging onto their computer programs before the start of their shifts and/or the activities of logging out of their computer programs and/or shutting down their computers after the end of their shifts and were not compensated for those activities.

d) All individuals who are or were employed by Defendants in Washington as Sales Consultants and/or Sales and Service Consultants at Defendants' Small Business and/or Consumer Call Centers between December 17, 2004 and the present and who, during that time, have performed the activities of booting up their computers and logging onto their computer programs before the start of their shifts and/or the activities of logging out of their computer programs and/or shutting down their computers after the end of their shifts and were not compensated for those activities.

e) Washington Wage Withholding Claim: All former employees employed by Defendants in Washington as Sales Consultants and/or Sales and Service Consultants at Defendants' Small Business and/or Consumer Call Centers between December 17, 2004 and the present, and who, during that time, have performed the activities of booting up their computers and logging onto their computer programs before the start of their shifts and/or the activities of logging out of their computer programs and/or shutting down their computers after the end of their shifts and were not compensated for those activities.

3. Plaintiffs' Motion in Support of Partial Summary Judgment [Docket No. 317] is **DENIED**.